PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
06/14/99
THOMAS  K. KAHN
CLERK

_____

No. 97-7024

_____

D. C. Docket No. 10-CA-30470

COOPER/T. SMITH, INC.,
CRESCENT TOWING CO., INC., et al.,

Petitioners-Cross-Respondents,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner.

_____

Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

_____

**(June 14, 1999)**

Before BIRCH and BARKETT, Circuit Judges, and HANCOCK\*, Senior District Judge.

_____

*Honorable James H. Hancock, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

BIRCH, Circuit Judge:

Cooper/T. Smith, Inc. ("Cooper" or "Employer"), and its wholly owned subsidiaries, Crescent Towing Co., Inc. ("Crescent Towing"), and Savannah Docking Pilots Association, Inc. ("Savannah Docking Pilots"), petition for review of an order by the National Labor Relations Board ("NLRB" or "Board") finding that they engaged in unfair labor practices in violation of sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §§ 158(a)(1), (5). The Employer acknowledges it refused to bargain with the union certified by the NLRB to serve as the representative for the docking pilots employed by Savannah Docking Pilots. Cooper argues, however, that the NLRB should not have certified the union because the docking pilots are "supervisors" within the meaning of the NLRA. A "supervisor" is not an "employee" for the purposes of the NLRA, and therefore, is not eligible for membership in an NLRB-certified bargaining unit. Because we conclude that the NLRB properly determined that the docking pilots are not supervisors, we deny the Employer's petition and grant the Board's application for enforcement of its order.

## I. BACKGROUND

Cooper, along with its subsidiaries, is a stevedoring company in the business of moving ships within the Port of Savannah. Crescent Towing employs

approximately twenty-six individuals and owns and operates three tugboats. Savannah Docking Pilots has only five employees -- three full-time docking pilots and two relief docking pilots.

When a large ocean-going vessel enters the port, it requires the assistance of tugboats to push, pull, and turn the ship during docking and undocking maneuvers. The docking pilot guides the tugboats and the vessel through this process. On a given day, the docking pilot receives from Cooper's dispatcher a list of ships scheduled to enter and leave the harbor. The schedule identifies the dimensions and location of each ship. The docking pilot considers this information, as well as other factors such as the wind, current, and tide, to determine the number of tugboats needed to perform the docking process for each vessel.

After a ship's pilot directs the ship into the port area from the sea, one of the tugboats delivers the docking pilot to the ship. Once aboard, the docking pilot takes control from the ship's captain and orchestrates the placement of the tugboats to guide the ship to or away from the dock. The docking pilot communicates his instructions to the captain of the tugboat by radio. After the docking pilot has completed the maneuver, he and the tugs move onto the next assignment on the schedule.

On April 8, 1997, the International Organization of Masters, Mates & Pilots, ILA, AFL-CIO ("MM&P" or "the Union") filed a petition with the NLRB seeking to

be certified as the representative of a unit including all docking pilots of the Savannah Docking Pilots. At a hearing before the NLRB's Regional Director, Cooper argued that the docking pilots were "supervisors" within § 2(11) of the NLRA, and therefore ineligible for participation in a bargaining unit. After reviewing the responsibilities and duties of the docking pilots employed by Cooper, the Regional Director found that while the pilots' job required skill in docking or undocking a ship, the tasks were routine and did not require the exercise of independent judgment. R3-502. The Regional Director further found that the pilots did not discipline or adjust employee grievances, although they did give their opinions on employees being considered for positions as relief or full-time docking pilots. Id. In concluding, the Regional Director found that the docking pilots employed by Cooper were not supervisors within section 2(11) of the NLRA and issued a Decision and Direction of Election. The Employer's request for review of this decision was denied by the NLRB. An election was held on July 9, 1997, and the docking pilots voted five to zero in favor of the Union. After MM&P was certified by the NLRB as the docking pilots' bargaining representative, the Union attempted to bargain with Cooper. Cooper refused to bargain in order to test the Union's certification.[1] The Union filed an unfair

[1]Board certifications under section 9(c) of the NLRA are not reviewable as final orders of the Board. See, e.g., AFL v. NLRB, 308 U.S. 401, 404-07, 60 S. Ct. 300, 301-03, 84 L.Ed. 347 (1940); NLRB v. South Miss. Elec. Power Ass'n, 616 F.2d 837, 839 (5th Cir. 1980). As a result, an employer can obtain review of the Board's representation decision only by refusing to bargain. The

labor practice charge against Cooper for refusing to bargain in violation of 29 U.S.C. § 158(a)(5). The Board granted summary judgment in favor of the Union. Cooper then filed a petition for review of the Board's determination. We turn now to that petition.

## II. STANDARD OF REVIEW

"When reviewing an order of the Board, we are bound by the Board's factual findings if they are supported by substantial evidence on the record as a whole." International Bhd. of Boilermakers v. NLRB, 127 F.3d 1300, 1306 (11th Cir. 1997) (internal quotations and citations omitted). To review a factual determination of the NLRB, we analyze the totality of the record and determine whether the conclusion is supported by substantial evidence. See NLRB v. Triple A Fire Protection, Inc., 136 F.3d 727, 734 (11th Cir. 1998), cert. denied, ___ U.S. ___, 119 S. Ct. 795, 142 L.Ed.2d 657 (1999). So long as the Board has made a plausible inference from the record evidence, we will not overturn its determinations, even if we would have made different findings upon a de novo review of the evidence. See International Bhd. of Boilermakers, 127 F.3d at 1306. We are not, however, "obliged to stand aside and rubber-stamp [our] affirmance of administrative decisions that [we] deem inconsistent

refusal triggers a ruling by the Board that the employer has engaged in an unfair labor practice. Since an unfair labor practice ruling is a reviewable final order, the court of appeals can then examine the Board's representation decision as part of its review of the unfair labor order.

5

with a statutory mandate or that frustrate the congressional policy underlying a statute." Id. (internal quotations and citations omitted). The Board, therefore, "cannot rest its conclusions on a scintilla of evidence or even on any amount of evidence that is less than substantial. Instead, the Board's order can be enforced only if we find in the record such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Northport Health Servs., Inc. v. NLRB, 961 F.2d 1547, 1550 (11th Cir. 1992) (internal quotations and citations omitted).

Despite this law, Cooper urges us to undertake de novo review, arguing that the Board should not receive deference in its decisions that certain employees are "supervisors" as defined in § 2(11) of the NLRA.[2] Cooper premises this theory on an assumption that the Board has demonstrated inconsistency in past supervisory cases. In light of this inconsistency, Cooper posits that we should employ a more stringent standard of review to the Board's determination than we have in our prior cases.[3]

---

[2]The old Fifth Circuit, binding precedent for our court, deferred on many occasions to the Board's decisions on supervisory status because of the infinite and subtle gradations of authority that will determine who, as a practical matter, falls within the statutory definition of "supervisory." See, e.g., NLRB v. San Antonio Portland Cement Co., 611 F.2d 1148, 1150 (5th Cir. 1980) (per curiam); GAF Corp. v. NLRB, 524 F.2d 492, 494 (5th Cir. 1975).

[3]Recently, a split in the circuits has developed about the degree of deference that should be accorded to the NLRB on its determination that an employee is a "supervisor" under § 2(11) of the NLRA. See Glenmark Assocs., Inc. v. NLRB, 147 F.3d 333, 338 (4th Cir. 1998) (observing that a thorough examination of the evidence "should be particularly true when the Board is determining supervisory status because of the inconsistency in the Board's application of the statutory definition and of the factors to be used in determining such application"); Spentonbush/Red Star Cos. v. NLRB, 106 F.3d 484, 492 (2d Cir. 1997) (finding the "Board's biased mishandling of cases

6

The difficulty with Cooper's argument is that it ignores the statutory basis for the standard of review which states that "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall . . . be conclusive." 29 U.S.C. § 160(f). Rather than make judicial adjustments to this statutory standard of review, we believe the wiser course is a robust application of the standard that has typified review of Board decisions. Stated succinctly, the Board must show that its determinations are supported by substantial

involving supervisors increasingly has called into question our obeisance to the Board's decisions in this area"); Schnuck Markets, Inc. v. NLRB, 961 F.2d 700, 704 (8th Cir. 1992) ("[S]crutiny is particularly appropriate in cases where the Board determines supervisory status."). But cf. Passavant Retirement & Health Ctr. v. NLRB, 149 F.3d 243, 246 (3d Cir. 1998) (holding that "[b]ecause of the Board's 'special competence' in the field of labor relations, its interpretation of the Act is accorded special deference" and noting that "[w]hether a [bargaining] unit is appropriate involves a large measure of informed discretion vested in the Board and is rarely to be disturbed") (internal quotations and citations omitted); Providence Alaska Med. Ctr. v. NLRB, 121 F.3d 548, 551 (9th Cir. 1997) ("Because the Board has expertise in making the subtle and complex distinctions between supervisors and employees, . . . the normal deference [we] give to the Board is particularly strong when it makes those determinations.") (internal quotations and citations omitted); Telemundo de Puerto Rico, Inc. v. NLRB, 113 F.3d 270, 274 (1st Cir. 1997) (same).

This confusion is not surprising in light of the Supreme Court's ambivalent attitude toward NLRB discretion in general. Compare Holly Farms Corp. v. NLRB, 517 U.S. 392, 398, 116 S. Ct. 1396, 1401, 134 L.Ed.2d 593 (1996) ("Courts, in turn, must respect the judgment of the agency empowered to apply the law 'to varying fact patterns' even if the issue 'with nearly equal reason [might] be resolved one way rather than another.") (internal citations omitted) with Allentown Mack Sales & Service, Inc. v. NLRB, 522 U.S. 359, ___, 118 S. Ct. 818, 827-28, 139 L.Ed.2d 797 (1998) (discussing an agency's potential to frustrate judicial review when it divorces "the rule announced from the rule applied. . . . If revision of the Board's standard of proof can be achieved thus subtly and obliquely, it becomes a much more complicated enterprise for a court of appeals to determine whether substantial evidence supports the conclusion that the required standard has or has not been met.").

evidence. If not, proper review by the court of appeals will reveal erroneous determinations by the Board. As we have noted, "[w]hen the Board misconstrues or fails to consider important evidence, its conclusions are less likely to rest upon substantial evidence." Northport Health Servs., 961 F.2d at 1550.

In proceedings before the NLRB, the burden of establishing the supervisory status of an employee is on the party asserting such a status. See NLRB v. Joy Recovery Tech. Corp., 134 F.3d 1307, 1313 (7th Cir. 1998).

### III.    DEFINITION OF "SUPERVISOR" UNDER THE NLRA

Determining whether an employee is a "supervisor" is particularly important because under the statutory structure of the NLRA, "supervisors" are not "employees." As a result, the NLRA's protection of the right of certain employees to unionize, see 29 U.S.C. § 157, does not extend to those employees deemed to be supervisors under § 2(11), see 29 U.S.C. § 152(3) (the "term 'employee' . . . shall not include . . . any individual employed as a supervisor"). Elucidating the boundaries of the definition of a "supervisor" is an "aging but nevertheless persistently vexing problem" of interpretation under section 2(11) of the NLRA. NLRB v. Security Guard Serv., Inc., 384 F.2d 143, 145 (5th Cir. 1967).

Section 2(11) of the NLRA defines a "supervisor" as:

any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or

discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in conjunction with the foregoing the exercise of such authority is not of a merely routing or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). The statutory definition lists the functions of a supervisor in the disjunctive, so Cooper only needs to prove that docking pilots fulfill one of these functions in order to succeed in its claim that the pilots are supervisors. See NLRB v. Dadco Fashions, Inc., 632 F.2d 493, 496 (5th Cir. Unit A 1980). As the Supreme Court has noted, three questions must be answered in the affirmative for an employee to be deemed a supervisor under section 2(11): "First, does the employee have authority to engage in 1 of the 12 listed activities? Second, does the exercise of that authority require 'the use of independent judgment'? Third, does the employee hold the authority in the 'interest of the employer'?" NLRB v. Health Care & Retirement Corp., 511 U.S. 571, 573-74, 114 S. Ct. 1778, 1780, 128 L.Ed.2d 586 (1994) ("HCR") (internal quotations and citations omitted).

We need not pause long to conclude that any authority the docking pilots exercise is in "interest of the employer" as required by the NLRA. The Supreme Court recently held in HCR that nurses act in the interest of their employer when they extend proper care to their patients. Responsibly caring for patients, the employer's customers, furthers the interests of the

employer because "[p]atient care is the business of a nursing home." See 511 U.S. at 577, 114 S. Ct. at 1782. The reasoning of the HCR court may be extrapolated to this case; by safely docking and undocking ships in the Savannah harbor, the docking pilots act in the best interest of Cooper. We focus our attention, therefore, on the first two questions set forth in HCR: (1) whether the docking pilots have the authority to engage in one of section 2(11)'s listed activities and (2) whether the exercise of that authority requires the use of independent judgment.

Cooper argues that the docking pilots have the authority to engage in three of the twelve activities listed in section 2(11). Specifically, Cooper argues that the pilots: (1) make "effective recommendations" on hirings and promotions, (2) "assign" work to employees, and (3) "responsibly direct" employees during the docking process. We will address each of these functions in turn, and consider whether the exercise of authority in these activities requires the use of independent judgment.

## A. Effective Recommendations on Hiring and Promotion

The Employer argues that the docking pilots have the primary input as to which personnel should be hired or promoted into various positions, such as relief docking pilot and tugboat captain. Edward Bazemore, Assistant Vice-President of Crescent Towing, testified that he never made a personnel decision against the

10

recommendations of the docking pilots. He further stated that he has never been on the ships owned by the companies during working operations and does not know how to operate a tugboat or dock a ship, so he relies absolutely on the advice of the docking pilots in determining who should be hired or promoted. The Employer argues that because the advice of the docking pilots is almost always followed, the docking pilots satisfy the NLRA's definition of supervisor by making effective recommendations on hirings and promotions. The Board found, however, that the ultimate decision on personnel matters rested with Bazemore and Charles Andrews, President of Crescent Towing, and thus the pilots' advice on personnel matters did not meet the requirements of the statute.

In NLRB v. Security Guard Service, Inc., 384 F.2d 143 (5th Cir. 1967), we held that the authority to make recommendations alone does not indicate supervisory status. Id. at 148. Other circuits take the same position. See e.g., NLRB v. Adco Elec., Inc., 6 F.3d 1110, 1117 (5th Cir. 1993) (holding that employee "recommend[ing] someone for hire and [bringing] problems with apprentice employees to the attention of [his superior] is nothing more than what [the employer] would expect from experienced employees"); George C. Foss Co. v. NLRB, 752 F.2d 1407, 1410-11 (9th Cir. 1985) (prudent employers seek advice of foremen in evaluating employees and this does not elevate foreman to supervisor status); Beverly

Enters. v. NLRB, 661 F.2d 1095 1100-1101 (6th Cir. 1981) (although nurses submitted evaluations and disciplinary reports, these did not rise to level of effective recommendations).

Adco Electronics is particularly relevant to the present case because, like apprentice electricians, Coast Guard regulations require that trainees make trips with pilots before becoming eligible for a pilot's license. Given this law, the fact that docking pilots train apprentice pilots or evaluate relief pilots and tugboat captains is not an indication of supervisory status, but rather reflects the nature of the docking pilot job itself. The Board noted that the pilots do not discipline other employees, deal with employee grievances, or perform formal evaluations. For these reasons, the Board correctly concluded that, based on the circumstances in the industry and Coast Guard regulations instituting an "apprenticeship" process, "the pilot's limited and informal involvement in the evaluation of trainees' work, without more, is insufficient to establish supervisory status under the Act." R3-503.

B.    Assignment of Work to Employees[4]

Once a docking pilot receives the schedule of ships docking and undocking in the port on a given day, he decides the number of tugs that will be needed based upon

---

[4]In the context of a docking pilot's functions, the activities of "assigning" and "responsibly directing" employees cannot entirely be separated. Additional aspects of the job will be further developed in Part III.C. of this opinion.

factors such as the dimensions and power of the ship and tidal conditions. Depending on the number of ships the Employer has scheduled for docking that day, a docking pilot's determination of the number and size of tugboats needed could necessitate bringing in overtime crews or calling a competitor to "rent" equipment. Cooper argues that the docking pilots' decision regarding the number of tugboats needed for a particular docking maneuver constitutes an assignment function of sufficient gravity to fall within section 2(11).[5]

We reach the opposite conclusion. Merely assigning a number of tugboats to perform a job does not elevate an employee to supervisory status, particularly when that assignment is based upon a schedule given to, rather than set by, that employee. In addition, the exercise of assignment authority requires the use of independent judgment. For example, in Providence Alaska Medical Center v. NLRB, 121 F.3d 548 (9th Cir. 1997), the Ninth Circuit found that for charge nurses, the task of assigning other nurses to work with certain patients did not require the exercise of independent judgment when the charge nurses made their assignments "within the parameters of the supervisory nurse's monthly assignment schedule." Id. at 552. See e.g., NLRB

---

[5]Cooper also argues that docking pilots make assignments when they order a tug to leave one ship and go to another; when they assign one tug the task of picking up and dropping off the docking pilot; or when the docking pilots instruct the tugs to look at construction in the port or the position of pipelines and dredges in the port. These tasks all flow from the initial assignment determinations based on the schedule for the day and do not require separate analysis under the statute.

v. Meenan Oil Co., 139 F.3d 311, 321-22 (2d Cir. 1998) (dispatchers who assign routes to other drivers were not supervisors because "neither the determination of the most efficient route, nor the assignment of jobs as they come in during the day, requires [the employee] to exercise independent discretion" where dispatchers have no control over the number of employees the company has and assigns employees to overtime off of a company list); Highland Superstores, Inc. v. NLRB, 927 F.2d 918, 921 (6th Cir. 1991) (leadmen warehouse workers were not supervisors partially because, although they assigned work to other employees every day, their assignment authority was limited by their supervisor's schedule of incoming and outgoing trucks to be unloaded).

More specifically, for an assignment function to involve independent judgment, the putative supervisor must select employees to perform specific tasks on the basis of a judgment about the individual employee's skills. See NLRB v. KDFW-TV, Inc., 790 F.2d 1273, 1279 (5th Cir. 1986) (assignment editors were not supervisors when they served primarily as a conduit for decisions already made by manager); cf. American Diversified Foods, Inc. v. NLRB, 640 F.2d 893, 896 (7th Cir. 1981) (fast food shift manager responsible for assigning fast food workers to particular tasks on a shift held to be supervisor because shift manager exercised independent judgment based on requirements of job and his opinion of individual employee's capabilities);

14

Arizona Pub. Serv. Co. v. NLRB, 453 F.2d 228, 231-32 (9th Cir. 1971) (employee was supervisor where he had power to "choose which lineman are to work, when and where"). Cooper has not shown that docking pilots make assignments of tugs based on the skills and experiences of the crews manning the tugs, but rather only on the schedule provided by Cooper and the power of the tugs in relation to the dimension of the ship to be docked. The docking pilots thus do not exercise independent judgment when assigning tugboats and do not satisfy the requirements of a section 2(11) supervisor in this function.

## C. Responsible Direction of Employees During Docking Process

Responsibility is defined as being "answerable for the discharge of a duty or obligation. Responsibility includes judgment, skill, ability, capacity and is implied by power." Meredith Corp. v. NLRB, 679 F.2d 1332, 1336 (10th Cir. 1982) (internal quotations omitted). The words "'responsibility to direct' are not weak or jejune but import active vigor and potential vitality." Security Guard Serv., 384 F.2d at 147. Cooper contends that docking pilots fulfill the function of "responsibly directing" others because they give commands during the docking and undocking process using their extensive knowledge of local conditions to determine how the tugs and lines should be placed for safety and efficiency. The Board, although recognizing the expertise and responsibility of the pilots, found that "such maneuvering orders, while

based on years of experience, are routine in nature and do not require the exercise of independent discretion necessary to establish supervisory authority." R3-502.

Cooper argues that the complexity and inherent dangers of the docking procedure preclude a finding that the direction of the docking pilots is "routine." Cooper cites Sun Refining & Marketing Co., 301 N.L.R.B. 642, 649 (1991), where the Administrative Law Judge held that ship's officers on oil supertankers were supervisors. The ALJ based his decision, in part, on the fact that operation of a supertanker could not be routine due to the dangerous nature of the work and disastrous consequences that could result from mistakes.

Drawing a line between "routine" direction and that which exercises independent judgment, as required by the NLRA, is particularly difficult when evaluating highly trained employees. We have determined previously, however, that directing others in work that may be complex and potentially dangerous is not enough to elevate an employee to supervisory status. See Exxon Pipeline Co. v. NLRB, 596 F.2d 704 (5th Cir. 1979). In Exxon, we held that oil movement supervisors, who monitored the flow of oil through the company's pipelines, were not supervisors even though they held "highly responsible positions." Id. at 705. See also McDonnell Douglas Corp. v. NLRB, 655 F.2d 932, 937 (9th Cir. 1981) (pilot was not supervisor because authority to ensure safety of plane is intrinsic part of any pilot's job and not

16

enough to elevate pilot to supervisory status).  Risk of the undertaking alone, then, is not enough to transform an employee into a supervisor.

We must determine, rather, whether the docking pilots direction function encompasses any managerial prerogative.  "Congress, in enacting § 2(11), sought to distinguish between true supervisors, those vested with 'genuine management prerogatives,' and other employees."  NLRB v. GranCare, Inc., 170 F.3d 662, 666 (7th Cir. 1999) (en banc) (quoting NLRB v. Bell Aerospace Co., 416 U.S. 267, 281, 94 S. Ct. 1757, 40 L.Ed.2d 134 (1974)).  See also Ross Porta-Plant, Inc. v. NLRB, 404 F.2d 1180, 1182 (5th Cir. 1968) ("In enacting § 2(11) of the Act Congress did not intend to exclude from its protection any individuals except those who possess true managerial powers."); NLRB v. Griggs Equip., Inc., 307 F.2d 275, 279 (5th Cir. 1962) (same).  The Supreme Court has noted that:

> The Board has recognized that employees whose decision-making is limited to the routine discharge of professional duties in projects to which they have been assigned cannot be excluded from coverage even if union membership arguably may involve some divided loyalty.  Only if an employee's activities fall outside the scope of the duties routinely performed by similarly situated professionals will he be found aligned with management.

Yeshiva, 444 U.S. at 690, 100 S. Ct. at 866 (footnote omitted).  As a result, the Board, at times, "reaches results reflecting a distinction between authority arising from

17

professional knowledge and authority encompassing front-line management prerogatives." HCR, 511 U.S. at 583, 114 S. Ct. at 1785.

In the present case, the docking pilots use their expertise to guide the tugboats. The expertise is not, however, exercised with a management prerogative, but rather as an experienced employee. Simply being a more experienced employee does not make the docking pilot a supervisor. See e.g., Providence Alaska Med. Ctr., 121 F.3d at 554 ("By exercising her professional judgment in this routine manner while working alongside and guiding less experienced employees, the charge nurse is not transformed into a supervisor."); Adco Elec., 6 F.3d at 1117 (employee was not a supervisor because his "status was that of a skilled craftsman guiding less experienced employees"). In GranCare, Inc., the Seventh Circuit observed that supervision "exercised in accordance with professional rather than business norms is not supervision within the meaning of the supervisor provision, for no issue of divided loyalties is raised when supervision is required to conform to professional standards rather than to the company's profit-maximizing objectives." 170 F.3d at 666-67 (citation omitted).

We also must consider to whom the docking pilots are giving direction during the docking and undocking process. The docking pilot communicates only with the tugboat captain during this procedure. The tugboat captain then determines how his

18

crew will follow the instructions of the pilot. In this situation, telling an employee

that a certain result must be reached is not "responsibly directing" within the meaning

of the NLRA. In Exxon, we rejected the company's argument that because an oil

movement supervisor (OMS) "makes an independent judgment whether a problem

must be corrected immediately, even to the extent that field employees must work

overtime, or whether a problem is minor and may be attended to later," the OMS is

a supervisor. 596 F.2d at 706. We determined, instead, that the OMS

> does little more than notify the field that a certain problem has occurred
> and request assistance in remedying it. He has no further authority or
> responsibility to direct the field personnel in the manner of performing
> their remedial duties. The field personnel are in a wholly separate
> department of the company and thus function in a different supervisory
> hierarchy from that of the OMS.

Id. Likewise, in the present case, the docking pilot does not always tell the tugboat

captain how to do his job. The docking pilot relays to the tug captain his instructions

and the tug captain then ensures that the instruction is carried out effectively by the

19

crew. The docking pilots do not direct the individual crew members on the tug,[6] and the parties agree the tugboat captains are themselves supervisors.[7]

Spentonbush/Red Star Cos. v. NLRB, 106 F.3d 484 (2d Cir. 1997) is inapposite. There, the Second Circuit, reversing the Board, determined that tugboat and barge captains were "supervisors" within the meaning of the NLRA. The court based its decision on the great deal of authority tug captains exert over boat and crew, such as the authority to take disciplinary action, as well as to dismiss any officer or crew member. Id. at 488. A docking pilot does not have such authority over a crew. In fact, he has no crew. While the Spentonbush court also considered the risks involved in the tug's duties, we have determined already that such risks cannot elevate a highly trained employee to that of a supervisor. Finally, we note that the

---

[6]Cooper asserts that because one of its docking pilots was fined $1000 by the Coast Guard for a bumping incident, the docking pilots are "responsible" for the docking procedure and therefore are supervisors. Again, Coast Guard monitoring of pilots' performances is a function of the nature of the docking pilot job itself and has no relation to the pilots' position within the Cooper organization.

[7]Furthermore, under the NLRA, for an employee to be a supervisor, he must responsibly direct "employees" of the employer. See Mourning v. NLRB, 559 F.2d 768, 770 (D.C. Cir. 1977) ("we would be inclined to agree . . . that a person generally may not be considered a 'supervisor' unless he exercises Section 2(11) authority over an 'employee' as defined by Section 2(3), which expressly excludes 'any individual employed as a supervisor.'"), accord McDonnell Douglas, 655 F.2d at 936. The docking pilots communicate only with the tugboat captain, who is a supervisor. Supervisors are statutorily excluded from the category of "employees" under the NLRA. As a result, if an employee directs only a supervisor, he cannot be directing an "employee" of the employer and cannot satisfy the terms of "responsibly direct" under section 2(11).

20

<u>Spentonbush</u> court undertook its analysis with a reduced level of deference to the Board's conclusion, a standard of review we have declined to adopt.[8]

Cooper argues that the docking pilots are supervisors because they exercise authority in making effective recommendations on hirings and promotions, assign work to employees, and responsibly direct employees during the docking process. We conclude, however, that the Board's determination that the docking pilots are not supervisors is supported by substantial evidence because the docking pilots do not use independent judgment when exercising the three functions posited by the Employer.

## IV.    EVIDENTIARY ISSUES

Cooper argues that the Board erred in refusing to permit the company to offer the testimony of a docking pilot from a competitor's company and a documentary on the duties of a docking pilot in a New York harbor produced by the A&E Television Network and the History Channel. Although the Board is not held as closely to the rules of evidence as are the courts, the NLRA provides that Board proceedings shall,

---

[8]Cooper contends that the fact that the docking pilots complete the bridge and tugboat tickets, enabling the company collects its fees, also is evidence of their status as a supervisor. <u>But see Adco Elec.</u>, 6 F.3d at 1118 ("performance of some clerical duties pertaining to time sheets, daily logs, and ordering materials does not demand supervisory status"). Cooper also argues that because the docking pilots are often out of contact with the Employer's managers for long periods of time, the pilots must be supervisors. The pilots, however, do have contact with the managers to the extent they receive a daily schedule of ships to be docked and undocked. We decline as well to make any inference based upon the fact that the Union here historically has represented individuals of "supervisor" status.

"so far as practicable," be conducted in accordance with the Federal Rules of Evidence. See NLRB v. United Sanitation Serv., 737 F.2d 936, 940 (11th Cir. 1984) (quoting 29 U.S.C. § 160(b)). The Board admitted testimony of docking pilots employed by Cooper. Under the Federal Rules of Evidence, a trial judge has broad discretion to exclude evidence in order to prevent needless introduction of cumulative evidence. Hopkins v. Britton, 742 F.2d 1308, 1311 (11th Cir. 1984).

In the present case, the Board heard testimony from the docking pilots employed by Cooper and was within its discretion to determine that testimony from another docking pilot and a visual representation of the docking procedure in a different harbor would be cumulative. Furthermore, determinations of the supervisory status of employees are made on a case-by-case basis. See Glenmark Assocs., 147 F.3d at 337. The experiences of a docking pilot in another company, then, would not necessarily assist the Board in making a determination of the responsibilities and duties of a docking pilot employed by Cooper. As a result, we find that the Board did not abuse its discretion in excluding the testimony of the competitor's docking pilot and the videotape of the documentary.

## V.  CONCLUSION

We conclude that the Board's determination that the docking pilots employed by Savannah Docking Pilots are not supervisors under § 2(11) of the National Labor

22

Relations Act is supported by substantial evidence. We recognize that this is a close case. The standard of review, however, becomes particularly important in close cases. We may not override the Board's choice between two fairly conflicting views. See NLRB v. Southern Fla. Hotel & Motel Ass'n, 751 F.2d 1571, 1579 (11th Cir. 1985). We agree that:

> had [the Board] chosen to weight the [employee's] responsibilities differently, [the Board] could have reached the opposite result. The question is admittedly close, yet its very closeness argues persuasively in favor of deference to the Board. It is particularly in the close cases that judges, who are generalists, should respect the specialized knowledge of the Board and accede to its factbound determinations as long as they are rooted in the record.

Telemundo de Puerto Rico, Inc. v. NLRB, 113 F.3d 270, 276 (1st Cir. 1997). We reach this determination bearing in mind also the fact that the petitioner bears the burden of proof.

For all these reasons, we DENY the Employer's petition and GRANT the Board's application for enforcement of its order.