**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-11150

————————————————

UNIVERSAL PROTECTION SERVICES, LLC,
  d.b.a. Allied Universal Security Services,

                                           *Petitioner-Cross Respondent,*

*versus*

NATIONAL LABOR RELATIONS BOARD,

                                           *Respondent-Cross Petitioner.*

INTERNATIONAL UNION,
SECURITY POLICE AND FIRE
PROFESSIONALS OF AMERICA,

                                                         *Intervenors.*

————————————————

Petitions for Review of a Decision of the
National Labor Relations Board
Agency No. 12-CA-305972

————————————————

Before ROSENBAUM, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

Universal Protection Services, LLC, doing business as Allied Universal Security Services ("Allied Universal"), petitions for review of the National Labor Relations Board's ("Board") determination that "lieutenants" Allied Universal employs are not supervisors, which meant that the National Labor Relations Act ("NLRA") required Allied Universal to collectively bargain with the lieutenants. In its petition, Allied Universal claims the Board's procedures violated Allied Universal's due process rights and challenges the substantive basis for the Board's decision. In response, the Board cross-petitions for enforcement of its order requiring collective bargaining. After careful review of the record and with the benefit of oral argument, we determine that the process the Board employed provided Allied Universal with the opportunity to be heard, and substantial evidence supports the Board's decision to order a representation election. Accordingly, we deny Allied Universal's petition for review of the Board's decision and grant the Board's application for enforcement.

## I.    Background

### A.    Allied Universal operations at Turkey Point

Allied Universal provides security services for the Turkey Point nuclear power facility in Florida City, Florida ("Turkey Point"). Allied Universal employs roughly 136 security officers, 24 lieutenants, and 4 captains at the facility, each of whom falls into a chain-of-command hierarchy. The company's chief official on site is the Project Manager, who oversees two division heads. The

head of the operations division oversees the four captains, who split between two shifts. Each of the four captains is responsible for six lieutenants, who in turn each oversee five to eight security officers.

Allied Universal employs a progressive discipline policy for employees, Policy 1308, that outlines three levels of offenses and the potential consequences for infractions ranging from minor violations to fireable offenses. Level I offenses are the most severe and involve serious misconduct such as "[a]bandoning a security post," "theft, dishonesty, fraud, [or] bribery," and "[u]nauthorized or reckless use of firearms or other weapons," among 30 listed offenses. The 12 Level II offenses include failures to follow procedure, such as reporting without all assigned equipment or losing a security badge, "[n]egligent use of a firearm or other weapon(s)," and failures to report to work or abuses of leave. The less severe Level III offenses include, among 11 violations, "[p]laying of pranks or practical jokes which interfere with professional performance of duty," failure to maintain control of security access badge outside the facility, and inattentiveness to security post responsibilities. Each offense level has a general catch-all provision that encompasses conduct not specifically listed.

Punishments for these violations vary based on the type of offense and whether the violator committed previous offenses. Allied Universal provides a table of disciplinary guidelines in its Policy 1308, reproduced below:

**Categories of Discipline Guidelines**

| Category | First Offense | Second Offense | Third Offense | Fourth Offense |
|---|---|---|---|---|
| **Level I** | *Discharge | | | |
| **Level II** | Written Counseling and: (Optional) 1. Reduction in Job or Supervisory Designation 2. Suspension from Work 3. Other Appropriate Action(s) | Written Counseling and Suspension | *Discharge | |
| **Level III** | Documented Oral Counseling | Written Counseling | Written Counseling and Suspension (Optional) 1. Reduction in Job or Supervisory Designation 2. Suspension from Work 3. Other Appropriate Action(s) | *Discharge |

While the guidelines call for "documented oral counseling" for first-time Level III offenses, Allied Universal in some circumstances allows informal "coaching" "to offer suggestions to help an employee improve performance." Allied Universal modifies the guidelines' application on occasion and escalates enforcement in response to performance issues it identifies.

Lieutenants enforce some forms of discipline for the guards they oversee. The guidelines charge lieutenants with "[e]nsuring that disciplinary action is justified, objectively documented, and fairly applied." Lieutenants can administer discipline up to written counseling, while captains can suspend violators for up to two workdays, and the project manager can issue longer suspensions or terminate violators.

B.    *Allied Universal workers' collective bargaining petition*

International Union, Security, Police, and Fire Professionals of America ("Union") filed a certification of representative petition

with the Board to represent, in collective bargaining, "all full-time and regular part-time armed and unarmed supervisors and lieutenants performing guard duties" at Turkey Point, excluding "all office clerical employees, professional employees and supervisors as defined by" the NLRA.[1]  The Board ordered a representation hearing before a Board hearing officer to determine whether the lieutenants were supervisors as defined under the NLRA; if so, the lieutenants would not be able to collectively bargain.[2]

Both Allied Universal and the Union participated in the hearing.  This participation included offering evidence and witnesses as well as cross-examining the other party's witnesses. Allied Universal introduced dozens of Employee Discipline/Corrective Action Notices that lieutenants had signed and issued to security officers.  Violations in these notices ranged from the mundane, such as doodling on a logbook, to the more serious, like failure to maintain necessary equipment.  Allied Universal's project manager testified that lieutenants made

---

[1] This petition was not the first attempt to unionize security workers at Turkey Point. *See Wackenhut Corp. & Int'l Union Sec., Police & Fire Pros. of Am. (SPFPA)*, 345 N.L.R.B. 850, 858 (2005); *G4s Regulated Sec. Sols., a Div. of G4s Secure Sols. (USA) Inc.*, 362 N.L.R.B. 1072, 1072 (2015).  We review the Board's decision based on the current record and not the facts of the prior disputes.

[2] Under the NLRA, supervisors are not employees who can organize and collectively bargain.  *See* 29 U.S.C. § 157 ("Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . ."); *see also* 29 U.S.C. § 152(3) ("The term 'employee' . . . shall not include . . . any individual employed as a supervisor . . . .").

decisions on which disciplinary tool to use of their own accord, and a captain testified that lieutenants independently investigated violations before administering discipline.

Lieutenants testified about how much discretion they had in administering discipline and how Allied Universal's policies constrained their actions. They described how they routinely consulted captains and other managers before issuing warnings but that such consultation was not mandatory. Lieutenants also said that those who did not administer discipline that captains or other higher-ups viewed as appropriate were themselves subject to discipline. One such example involved the project manager reviewing discipline lieutenants issued when security officers had not properly followed procedure in checking door security during fire-watch patrols. After expressing his view that the discipline was proper, the project manager gave the lieutenants the option of whether to "stick to our guns and tell the union we're not going to change the discipline" or to modify the discipline, saying, "whatever you want to do, I will support." No lieutenant changed his position.

Lieutenants who testified also noted that they followed the Policy 1308 guidelines in administering discipline. One testified that to administer discipline, he would look at the "level of event, number of occurrences and then [he] would just match that up and that's what [he] land[ed] on, that's what [he] issue[d]."

### C.    The Board grants the petition

Based on the record from the hearing, the Board's regional director granted the petition, approved the bargaining unit as described, and ordered a representation election.  In doing so, the regional director observed that Allied Universal bore the burden of proving the lieutenants were supervisors, and that a lack of evidence was construed against Allied Universal as the party asserting supervisory status.  He further explained that if the evidence was inconclusive, supervisory status was not shown.  Importantly, simply "being in charge" of other employees did not automatically confer supervisory status under the NLRA.  Instead, the exercise of "independent judgment" controlled whether individuals issuing discipline were considered supervisors, and following detailed orders or regulations "[did] not confer supervisory status."  Applying these principles to the record, the regional director found that the limited discipline issued by lieutenants "appear[ed] to be based on the mechanistic application of the detailed Policy 1308" and that the lieutenants "lack discretion because their decisions . . . are further significantly restricted by the directives and review of captains and managers."  Overall, the regional director concluded that "disciplinary decision[s] made by lieutenants are routine and clerical in nature."  Accordingly, the regional director found that the evidence was insufficient to establish the lieutenants were supervisors within the meaning of the NLRA based on their issuance of discipline.  And with that finding, the regional director also found that the lieutenants could collectively bargain if they voted in favor of a union.

The Union won the election. Nineteen of the twenty-three eligible voters cast votes. Eighteen voted for Union representation, and one ballot was void.

While the election process progressed, Allied Universal filed objections to the regional director's decision to allow the election, which the regional director overruled. Allied Universal then sought review by the Board, which the Union opposed. The Board issued an order denying review of the regional director's decision, finding "no substantial issues warranting review."

This order was not the end of the dispute. After the election and the Board's denial of further review, the Union filed a charge with the Board against Allied Universal for unfair labor practices alleging that Allied Universal was refusing to collectively bargain with the lieutenants. The Board's general counsel issued a complaint to that effect. In response to the complaint, Allied Universal admitted that it had refused to bargain with the Union, justifying its refusal because it had "no legal obligation" to bargain with a bargaining unit that improperly included lieutenants Allied Universal maintained were supervisors. Because Allied Universal did not dispute that it had not collectively bargained with the Union, the Board's general counsel moved for summary judgment, which Allied Universal opposed. The Board granted the motion, finding that the issues Allied Universal raised were the same as those considered in the decision regarding representation (the "representation proceeding") and that without new evidence,

summary judgment was appropriate.  The Board ordered Allied Universal to bargain with the Union.

Allied Universal petitioned for review of the Board's decision finding Allied Universal had violated the NLRA in refusing to bargain.  The Board cross-petitioned to seek enforcement of its order.  We granted the Union permission to intervene.

## II.    Discussion

Allied Universal contends that two grounds support reversal of the Board's decision.  First, Allied Universal argues that the Board's structure represents "an unconstitutional usurpation of power and deprives companies like Allied Universal of their due process rights."  Second, Allied Universal questions the Board's substantive decision, arguing that we should reject the substantial evidence standard of review that we traditionally apply to Board proceedings and instead review the Board's decision *de novo*.  Allied Universal asserts that under any standard, the Board's decision that lieutenants were not supervisors was incorrect, and that the lieutenants' authority to discipline other employees shows they exercised independent judgment and were not statutory supervisors under the NLRA.  We address each contention in turn.

### A.    Allied Universal's constitutional claims

We "review *de novo* questions of constitutional law." *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1181 (11th Cir. 2017) (*en banc*).

Allied Universal argues that the Board's procedures are unconstitutional because they amount to the Board serving as "prosecutor, judge, and jury" in this dispute and that unfair labor charges are "fundamentally indistinguishable" from suits at common law that implicate the Seventh Amendment right to trial by jury. Under that logic, Allied Universal contends it was entitled to a jury trial in this dispute. In the alternative, Allied Universal argues that even if the Seventh Amendment jury trial right does not apply directly, the Board's process implicates due process concerns because it did not allow for the final decisionmaker to view live testimony and make appropriate credibility determinations. Instead, the Board delegated the representation hearing to a hearing officer to develop a record on which the Board's regional director based his decision, thus depriving Allied Universal of its opportunity to be heard. Allied Universal also argues that the Board's adjudication structure is unconstitutional.

The Board responds that the Seventh Amendment does not apply to Board proceedings like the representation dispute here because labor disputes under the NLRA are different from suits at common law. The Board further argues that the Board's structure

and procedures did not violate Allied Universal's due process rights.  We agree with the Board.[3]

Allied Universal's due process claims about its inability to offer live testimony before the final decisionmaker do not render the Board's procedures unconstitutional.  "The Fifth Amendment guarantees no particular form of procedure; it protects substantial rights."  *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 351 (1938) (upholding Board process when parties had the chance to define their arguments and suffered no detriment).  "Much of the work of the Board necessarily has to be done through agents."  *NLRB v. Duval Jewelry Co. of Miami*, 357 U.S. 1, 7 (1958) (approving the delegation of preliminary rulings to hearing officers).

Allied Universal takes issue with the fact that the hearing officer who presided over the representation hearing was not the regional director who issued the Board's decision in the representation proceeding.  This infirmity, Allied Universal argues, meant the Board did not provide Allied Universal with the necessary opportunity to be heard.  Not so.  Congress allowed the Board "to delegate to its regional directors its powers" of

---

[3] The Board argues that we should not consider Allied Universal's Seventh Amendment jury trial arguments because Allied Universal did not raise them before the Board.  *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.")  The Board is correct; Allied Universal did not raise the jury trial issue before the Board, and we decline to consider it.  *Cf. NLRB v. Goya Foods of Fla.*, 525 F.3d 1117, 1126 n.13 (11th Cir. 2008).

determining the appropriate unit for collective bargaining. 29 U.S.C. § 153(b). The statute further provides that a representation hearing "may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto." *Id.* § 159(c)(1). And Allied Universal points to no authority indicating that representation proceedings such as this one are subject to procedures beyond those laid out by Congress, or are contrary to the standard practice of delegating some tasks to hearing officers. *See Duval Jewelry Co.*, 357 U.S. at 7.

Allowing a Board hearing officer to facilitate the creation of a record from which the regional director can decide whether to grant a representation election did not deprive Allied Universal of an opportunity to be heard. *See id.*; *see also Mackay Radio & Tel. Co.*, 304 U.S. at 351. Both Allied Universal and the Union had the opportunity to develop the factual record and to cross-examine witnesses at the representation hearing, and to challenge the regional director's decision both to the Board and in this Court. That process was sufficient to allow both sides to be heard. *See Grannis v. Ordean*, 234 U.S. 385, 394 (1914) ("The fundamental requisite of due process of law is the opportunity to be heard."). Thus, this representation proceeding did not violate Allied Universal's due process rights.[4]

---

[4] Allied Universal's general claims about the Board's unconstitutional structure, based on a Fifth Circuit decision, are inapposite. *See Space Expl. Techs. Corp. v. Nat'l Lab. Rels. Bd.*, 151 F.4th 761, 767 (5th Cir. 2025). There, our sister circuit held that "ALJs are inferior officers insulated by two layers of

B.        *The merits of the Board's decision.*

Satisfied that the Board's process for the representation proceeding was constitutional, we now examine the Board's determination on the merits.    We must first determine the appropriate standard of review for Board decisions, then apply that standard to the facts.

1.    The substantial evidence standard applies after *Loper Bright*.

Allied Universal urges us to review the Board's determination *de novo*, arguing that following *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), we owe no deference to the Board's construction of the NLRA.    Allied Universal's argument misconstrues the basis for our standard of review on two fronts.    First, our direction to review based on substantial evidence comes from statute, not Board precedent.    And second, while *Loper Bright* instructs us to review legal questions *de novo*, it does not modify the standard of review we apply to the Board's findings of fact.

First, our statutory imperative.    The NLRA allows for our review of Board final orders.    *See* 29 U.S.C. § 160(f) ("Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged

---

for-cause removal protection," making the Board's adjudication structure unconstitutional.  *Id.*  No ALJ was involved in the proceedings here.

in or wherein such person resides or transacts business . . . .").  And the NLRA instructs that "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall . . . be conclusive."  *Id.*

Second, we consider the Supreme Court's guidance.  The Court in *Loper Bright* observed that the Administrative Procedure Act

> codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment.  It specifies that courts, not agencies, will decide *all* relevant questions of law arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it.  And it prescribes no deferential standard for courts to employ in answering those legal questions.  That omission is telling, because [the statute at issue] *does* mandate that judicial review of agency policymaking and factfinding be deferential.

603 U.S. at 391–92 (emphasis in original) (citations and quotation omitted).  The Court went on to cite the "substantial evidence" standard for factfinding as reflecting the distinction between questions of law and questions of fact.  *Id.* at 392 (differentiating between courts deciding "legal questions" and "judicial review of agency policymaking and factfinding").  And that distinction applies directly here.

Allied Universal's challenge centers on the merits of the Board's findings of fact, not the Board's legal conclusions. The Board concluded, based on the record, that lieutenants were not supervisors for the purposes of the NLRA. And under our precedent, that determination is a question of fact. *See Cooper/T. Smith, Inc. v. NLRB*, 177 F.3d 1259, 1261 (11th Cir. 1999) (rejecting argument that employees were supervisors because the Board made findings as to "questions of fact" that were supported by substantial evidence). Because *Loper Bright* did not alter that standard, we must follow both our precedent and the statute in applying the substantial evidence standard of review. *See id.*; 29 U.S.C. § 160(f).

Allied Universal rightly points out that, post-*Loper Bright*, we review the Board's conclusions on legal questions *de novo*, without deference. For example, Allied Universal notes the Board places the burden of proof on the party seeking to show supervisory status, *see NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 710–11 (2001), and the Board has developed its own precedent regarding the "independent judgment" test for supervisory status, *see In re Oakwood Healthcare, Inc.*, 348 N.L.R.B. 686, 692–93 (2006). But we have accepted those tests in past decisions, and "the holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite [*Loper Bright*'s] change in interpretive methodology." *Loper Bright*, 603 U.S. at 412; *see Ky. River*, 532 U.S. at 711 (noting the burden of proof); *Lakeland Health Care Assocs., LLC v. NLRB*, 696 F.3d 1332, 1339 (11th Cir. 2012) (applying the "independent judgment" standard).

Thus, we ask whether substantial evidence supports the Board's decision and apply our existing precedents that remain binding even after *Loper Bright*.

2.  Substantial evidence supports the Board's finding.

In reviewing Board decisions, "we analyze the totality of the record and determine whether the conclusion is supported by substantial evidence." *Cooper/T. Smith, Inc.*, 177 F.3d at 1261; *see* 29 U.S.C. § 160(f) (directing us to apply the "substantial evidence" standard in reviewing Board factual determinations).  If "the Board has made a plausible inference from the record evidence, we will not overturn its determinations, even if we would have made different findings upon a *de novo* review of the evidence."  *Id.*  The Board must base its decision on more than "a scintilla of evidence"; the record must show "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* at 1261–62.

Allied Universal argues that the Board should have found that lieutenants were supervisors and that Allied Universal did not have to collectively bargain with them.  It contends that lieutenants' discipline decisions are "fundamentally discretionary" despite the existence of discipline guidelines and that the record does not show lieutenants issued discipline only for "easily discernable" offenses.  Allied Universal further argues that the role captains played in lieutenants' decisions about discipline does not mean lieutenants lacked discretion.

Under the NLRA, supervisors are not employees who can organize and collectively bargain.  *See* 29 U.S.C. § 157 ("Employees

shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . ."); *see also* 29 U.S.C. § 152(3) ("The term 'employee' . . . shall not include . . . any individual employed as a supervisor . . . ."). As relevant here, the law defines a "supervisor" as someone with the "authority, in the interest of the employer, to . . . discipline other employees, . . . or effectively recommend such action, if in connection with the foregoing, the exercise of such authority is not of a merely routine or clerical nature but requires the use of independent judgment." 29 U.S.C. § 152(11). Independent judgment requires that an individual "must at minimum act, or effectively recommend action, free of the control of others and form an opinion or evaluation by discerning and comparing data." *Lakeland Health*, 696 F.3d at 1339 (quotation omitted). Previous Board decisions have found that "judgment is not independent if it is dictated or controlled by detailed instructions, whether set forth in company policies or rules, the verbal instructions of a higher authority, or in the provisions of a collective-bargaining agreement." *In re Oakwood Healthcare, Inc.*, 348 N.L.R.B. at 693.[5] In short, disciplinary policies that do not allow for discretionary choices do not show an

---

[5] The Board's legal determinations are not binding on this Court. *See Loper Bright Enters.*, 603 U.S. at 392 (2024) ("[C]ourts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action.") (quotation omitted). That said, we view the Board's discussion in *Oakwood* of the independent judgment standard as consistent with our own binding precedents. *Compare Lakeland Health*, 696 F.3d at 1339 *with In re Oakwood Healthcare, Inc.*, 348 N.L.R.B. at 693.

individual exercises the independent judgment to qualify as a supervisor under the NLRA.  *Id.*

In analyzing the record, the regional director for the Board considered that Policy 1308 places some disciplinary authority in lieutenants, but concluded that they did not exercise independent judgment.  Instead, the policy lays out a grid and an extensive list of violations, specifying punishment down to the detail of whether it is oral or written, resulting in what the regional director determined was a "mechanistic application" of Allied Universal's guidelines.  Looking deeper into the circumstances of the discipline, the regional director found that workers higher in the chain of command, including captains and the project manager, were often involved in lieutenants' disciplinary decisions either by providing insight when a lieutenant sought guidance or correcting disciplinary decisions that the higher-ups believed were inappropriate.  And captains reviewed each disciplinary action before it was issued, further limiting lieutenant discretion.

Of the violations that led to discipline that the regional director analyzed, he found that many, if not most, were binary in nature—a security officer either did or did not check a door or have a piece of equipment—and did not require independent judgment. The director also dismissed Allied Universal's argument that because higher officials did not conduct investigations independent of lieutenants, lieutenants necessarily had discretion.  Instead, he found that recommendations the lieutenants made to higher officials for discipline did not reflect independent judgment.

Allied Universal bore the burden of proof to show that lieutenants exercised independent judgment. *See Ky. River*, 532 U.S. at 711. Based on the record, the regional director did not err in finding that Allied Universal did not meet that burden. Policy 1308 provides detailed instructions on enforcing Allied Universal's disciplinary policies, and higher supervisors were constantly involved in the lieutenants' imposition of discipline. Allied Universal argues that the existence of guidelines should not undercut supervisory status because that would mean "that no one is truly a supervisor." But the regional director did not find that the guidelines' mere existence meant the lieutenants were not supervisors. Instead, the regional director concluded that based on the policies in place here, including oversight, lieutenants did not exercise independent judgment. Different circumstances involving less detailed controlling guidelines or less involvement from higher-ups may very well result in a different determination. *See Cooper/T. Smith, Inc.*, 177 F.3d at 1261 (explaining that, under the substantial evidence standard, we will not overturn "plausible" board decisions "even if we would have made different findings upon a *de novo* review of the evidence"). But based on this record, there is substantial evidence—"relevant evidence as a reasonable mind might accept as adequate to support a conclusion"—to support the Board's finding that lieutenants were not supervisors. *See id.* Accordingly, we will not overturn the Board's decision.

### III.    Conclusion

The Board's process in administering the dispute over the representation election was not a violation of due process, and

substantial evidence supported the Board's decision that lieutenants were not statutory supervisors under the NLRA. Thus, the Board did not err in ordering the election or in finding that Allied Universal's refusal to bargain was an unfair labor practice.

**PETITION FOR REVIEW DENIED. APPLICATION FOR ENFORCEMENT GRANTED.**